J-S08006-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| WAYNE JAMES, | : | |
| | : | |
| Appellant | : | No. 704 EDA 2014 |

Appeal from the Judgment of Sentence October 7, 2013,
Court of Common Pleas, Philadelphia County,
Criminal Division at No(s): CP-51-CR-0014092-2011,
CP-51-CR-0014093-2011, CP-51-CR-0014094-2011,
CP-51-CR-0014095-2011 and CP-51-CR-0014096-2011

BEFORE:  DONOHUE, WECHT and JENKINS, JJ.

MEMORANDUM BY DONOHUE, J.:                 **FILED FEBRUARY 13, 2015**

Appellant, Wayne James ("James"), appeals from the judgment of sentence following his convictions for murder in the first degree, 18 Pa.C.S.A. § 2502, and four counts of aggravated assault, 18 Pa.C.S.A. § 2702.  James challenges the trial court's finding that the police had probable cause to arrest him and the sufficiency of the evidence in support of the murder conviction.  For the reasons that follow, we affirm.

The trial court summarized the relevant factual background of the case as established at trial:

> Before midnight on June 25, 2011, [James] entered the Genesis Tavern and ordered a bottle of Guinness from the bar.[6]  Notes of Testimony (N.T.) 10/3/2013 at 47.  After having another drink and smoking a cigarette at the bar, [James] was asked by the security personnel at the Genesis Tavern to leave.

N.T. 10/2/2013 at 220-21. [James] refused to cooperate; one of the bouncers dragged [James] by his upper body while he held "his feet in place on the ground so that he would not be walking." N.T. 10/1/2013 at 89-90. Jerrell Johnson, one of the bar's patrons, stated, "He was not going out willingly." Id. at 163.

Once he was removed from the bar, [James] jumped in the air and ran off toward a dark-colored car. N.T. 10/2/2013 at 80. Albert Saboleh, the manager on duty that night, noticed that the security personnel did not return to the bar immediately after ejecting [James]; Mr. Saboleh exited the bar and heard the man who had just been thrown out yell, "I'll be back" or a similar phrase. N.T. 10/3/2013 at 113-14. [James] then entered his car and sped off, nearly crashing into another car. N.T. 10/2/2013 at 80-81.

Approximately ten to fifteen minutes later, [James] returned to the area and opened fire as he approached the bar. Id. at 83-84. Security guard Curtis Aiken was positioned outside of the bar, checking identification cards, when [James] returned:

> MR. AIKEN: [W]hen you first came into the bar, you had a two-piece dress set [sic]. When you came back, you had a t-shirt on. When I caught vision of you, it's when the first shot – when the first couple of shots case, I ran behind the trash compactor. I lifted my head up, pow, and I was shot. It's nothing hard. The way – how the corner is shaped, you could see. And you have eyes, you could see. It's just plainly in view.

Id. at 113.

[James] walked through the front door of the Genesis Tavern, stood in the doorway and continued to fire his gun. Id. at 94. "After he delivered the

shots, he went in the middle of the street and jumped in the air a few [] more times. After he did that, he marched up and then he ran back down the street to where his car was at."[7] Id. at 84. As soon as [James] reentered his car, Aiken ran into the bar to tend to the injured patrons. Id. Inside, Aiken found a man, Carl Sharper, between the bar and the kitchen, lying on the floor with a gunshot wound to the middle of his head. N.T. 10/2/2013 at 85. Assistant Medical Examiner Dr. Marlon Osbourne determined that the bullet fractured Mr. Sharper's head, passed through his right cerebral hemisphere and caused immediate death. Id. at 33-34.

In addition to Mr. Sharper, at least four other individuals suffered gunshot wounds. Inside the bar, Aiken found Mr. Saboleh,[8] who had suffered a gunshot wound to his foot. Id. at 85. With help from others, Aiken lifted Mr. Saboleh and placed him in a police car, which transported him to the hospital. Id. at 86. Tamatha Robinson, a patron inside the bar, suffered six gunshot wounds. N.T. 10/1/2013 at 93-94. Jerrell Johnson was struck by three bullets, one of which shattered his clavicle. Id. at 166, 177. And, lastly, Charlotte McKee was hit by three bullets to her leg and foot. N.T. 10/2/2013 at 45-46.

---

[6] Scott Copeland, Latent Fingerprint Expert from the Philadelphia Police Department, compared [James'] fingerprints to a print lifted from a Guinness bottle found inside the Genesis Bar and found it to be a match. N.T. 10/2/2013 at 157.

[7] Aiken's identification of [James] as the shooter was bolstered by the testimony of Detective James Dunlap, a member of the Digital Imagery Response Team (DIVRT). Detective Dunlap pieced together footage from various security cameras which indicated that the person who returned to the bar and opened fire was the same person who had been ejected earlier. "If you look and watch the wrist

right here on the stills, in appears to be very similar, the same piece of jewelry on the shooter's wrist that was worn by the male that was previously thrown out." N.T. 10/2/2013 at 223.

[8] Aiken referred to Albert Saboleh as "Al." N.T. 10/2/2013 at 85.

Trial Court Opinion, 8/5/2014, at 2-3.

James fired his court-appointed counsel on the first day of trial and demanded to represent himself. The trial court, after cautioning him against it, agreed to James' self-representation, but refused to permit any delay or postponement for preparation. After a three-day trial, a jury convicted James of the above-referenced crimes. The trial court sentenced him to the mandatory term of life in prison without the possibility of parole. Newly appointed counsel filed post-sentence motions, which the trial court denied on February 27, 2014. This timely appeal followed, in which James raises two issues for our consideration and determination:

1. The trial court erred in ruling that police had probable cause to arrest [James] on July 28, 2011. Stated differently, the trial court erred by denying James' motion to suppress a statement James made subsequent to his arrest where the arresting officers lacked probable cause to arrest him.

2. The Commonwealth failed to prove beyond a reasonable doubt that [James] had the specific intent to murder Carl Sharper.

James' Brief at 1-2.

For his first issue on appeal, James contends that the trial court erred in denying his motion to suppress a statement he made subsequent to his arrest. James argues that the evidence the Commonwealth presented at the June 6, 2013 suppression hearing did not establish that the police had probable cause to effectuate a warrantless arrest, and that as a result his subsequent statement to police should have been suppressed.

When addressing a trial court's denial of a suppression motion, our standard of review is whether its factual findings are supported by the evidence presented at the suppression hearing and whether its legal conclusions drawn from those facts are correct. *In the Interest of L.J.*, 79 A.3d 1073, 1088–89 (Pa. 2013). In so doing, we must consider only the Commonwealth's evidence and so much of the evidence of the defense as remains uncontradicted. *Commonwealth v. Davis*, 102 A.3d 996, 999 (Pa. Super. 2014).

The parties agree that the police needed probable cause to arrest James. Probable cause is established when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Thompson*, 985 A.2d at 931 (quoting *Commonwealth v. Rodriguez*, 585 A.2d 988, 990 (Pa. 1991). We require only a "probability, and not a prima facie showing, of criminal activity."

*Illinois v. Gates*, 462 U.S. 213, 235 (1983). In determining whether probable cause exists, we apply a totality of the circumstances test. *Commonwealth v. Clark*, 735 A.2d 1248, 1252 (Pa. 1999).

The trial court reached the following factual findings based upon the evidence introduced at the suppression hearing:

> [A]round 8:00 PM on June 27, 2011, a male who identified himself as Leonardo Waysone approached Philadelphia Police Officer Jonathan Switaj and his partner, Officer Pierre, as they were conducting a car stop on the 4300 block of Wissahickon Avenue. N.T. 6/6/2013 at 9-13, 98. Mr. Waysone told the officers that he had information about the shooting that had taken place at the Genesis Tavern. Id. at 15, 98. As Mr. Waysone seemed "kind of nervous," the officers asked Mr. Waysone to reconvene with them behind a bus depot, away from the busy street. Id. at 11, 98. There, Mr. Waysone stated that his cousin, [James], was the shooter at the Genesis Tavern and that [James] lived with his uncle at 10th and Wagner Streets in Philadelphia, PA. Id. at 15, 98-99. Mr. Waysone explained to the officers that he saw surveillance video of the incident at the Genesis Tavern on the news and recognized his cousin from that video. Id. at 18, 102; Exhibit M-5.[11]
>
> Detective William Holmes, who had been made aware of Mr. Waysone's statements to police and had personally watched the surveillance video from inside the Genesis Tavern, asked Detective Derrick Jacobs to survey the area near 10th and Wagner Streets for a black Volvo.[12] N.T. 6/6/2013 at 57, 99. Detective Holmes had also provided Detective Jacobs with some information about [James] – either a physical description or [James'] name along with a police photo. Id. at 38, 60, 100. Detective Jacobs traveled to that area of the city and found a black Volvo in front of 1114 Wagner Street. Id. at 58, 99. While there, Detective Jacobs observed a man, who

appeared to be [James], exit from a silver-colored Suzuki and enter the premises of 1114 Wagner Street. Id. at 37, 99-100. Detective Jacobs relayed that information to Detective Holmes, who prepared a search warrant to search for [James] as well as certain items inside of 1114 Wagner Street.[13] At 8 AM, Detective Holmes arrived with U.S. Marshals and executed the search warrant. Id. at 63, 100. Inside the residence at 1114 Wagner Street, the law enforcement personnel found [James] and took him into custody. N.T. 6/6/2013 at 64, 100.

---

[11] Although this [c]ourt did not explicitly refer to Exhibit M-5 in its findings of fact, this exhibit was a source upon which this [c]ourt relied in making certain factual findings. Exhibit M-5 was the sole source for some facts that this [c]ourt found: that Mr. Waysone gave a statement to Detectives Spotwood and Mangioni at 9:45 PM on June 27, 2011; that that Mr. Waysone told officers that he saw the surveillance video from the Genesis Tavern on the news and, from that video, recognized [James] at the shooter. N.T. 6/6/2012 at 98-102. This exhibit was moved into evidence during the hearing on the motion to suppress. Id. at 89.

[12] Exhibit M-5 reflects that Mr. Waysone told the police that [James] drives a "black four door Volvo[.]"

[13] Since this location was not [James'] known residence, a search warrant was required before the police could breach those premises to seize [James]. …

Trial Court Opinion, 8/5/2014, at 4-5.

In its written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court determined that the tip provided by Mr. Waysone provided the police with probable cause to arrest James.

The trial court based its decision on four factors: (1) his familial connection to James strengthened his identification; (2) the implication of his own family member subjected Mr. Waysone to potential legal and/or practical consequences; (3) his cooperation with the police; and (4) the content of the tip reflected familiarity with James' affairs. *Id.* at 7-8. On appeal, James argues that Mr. Waysone's tip was not sufficient, as the police accepted it without developing sufficient corroborating evidence of the information he provided or otherwise inquiring further into his credibility. James' Brief at 16.

Based upon our review of the certified record, we conclude that Mr. Waysone's tip provided the police with probable cause to arrest James. In ***Commonwealth v. Washington***, 63 A.3d 797 (Pa. Super. 2013), this Court recently reaffirmed that the police may, in the absence of special circumstances, assume that **identified** citizens who report their observations of criminal activity are trustworthy. *Id.* at 803; ***Commonwealth v. Gutierrez***, 36 A.3d 1104, 1108 (2012); ***Commonwealth v. Hayward***, 756 A.2d 23, 36 (Pa. Super. 2000) ("Identified citizens who report their observations of criminal activity to the police are assumed to be trustworthy, in the absence of special circumstances."). A known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, unlike an unknown informant, who faces no such risk. *Id.* When an identified third party provides information

to the police, we must examine the specificity and reliability of the information provided.  *Id.*;  ***Commonwealth v. Barber***, 889 A.2d 587, 593–94 (Pa. Super. 2005).

In the present case, Mr. Waysone voluntarily approached the police, identified himself, and provided specific information regarding his belief that James had committed the crimes at the Genesis Tavern, including his identification of James (his cousin) from a video of the shootings he had seen on the TV news.  He also provided detailed information regarding James, including where he lived and the type of car he drove – which information the police corroborated before making the arrest.  Under the circumstances, the police could presume Mr. Waysone to be trustworthy, and their (albeit limited) independent investigation into the information he provided further strengthened their belief in the reliability of his knowledge regarding James.  No relief is due on James' first issue on appeal.

For his second issue on appeal, James challenges the sufficiency of the evidence presented at trial in support of his conviction for first-degree murder.  James contends that the evidence shows only that he shot wildly while inside the Genesis Tavern without targeting any particular victim, and that no evidence established a specific intent to kill Carl Sharper.  Instead, James argues that the "appropriate conviction for [his] random, reckless, indifferent, and cruel act is third-degree murder, not first-degree."  James' Brief at 20.

Our standard of review when presented with a challenge to the sufficiency of the evidence supporting a criminal defendant's conviction is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

***Commonwealth v. Franklin***, 69 A.3d 719, 722-23 (Pa. Super. 2013) (quoting ***Commonwealth v. Pettyjohn***, 64 A.3d 1072, 2013 (Pa. Super. (2013) (citations and quotation marks omitted)).

To sustain a conviction for first-degree murder, the Commonwealth must prove that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the accused did the killing, and that the killing was done with deliberation. ***Commonwealth v. Simpson***, 754 A.2d 1264, 1269 (2000), *cert. denied*, 562 U.S. 255 (2000); ***Commonwealth v. Hall***, 701 A.2d 190, 196 (Pa. 1997), cert. denied, 523 U.S. 1082 (1998). The specific intent to kill distinguishes murder in the first degree from lesser grades of murder. ***Commonwealth v. Smith***, 694 A.2d 1086, 1088 (Pa. 1997), *cert. denied*, 525 U.S. 847 (1998). The period of reflection required for premeditation to establish the specific intent to kill "may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." ***Commonwealth v. Rivera***, 983 A.2d 1211, 1220 (Pa. 2009) (quoting ***Commonwealth v. Drumheller***, 808 A.2d 893, 910 (Pa. 2002)).

The Commonwealth may prove the specific intent to kill with circumstantial evidence. ***Commonwealth v. Fletcher***, 861 A.2d 898, 907 (Pa. 2004). Our Supreme Court has repeatedly held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific

intent to kill. *See, e.g.*, *Commonwealth v. Randolph*, 582 576, 583, 873 A.2d 1277, 1281 (Pa. 2005); *Fletcher*, 861 A.2d at 907; *Commonwealth v. McCrae*, 832 A.2d 1026, 1030 (Pa. 2003); *Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001), *cert. denied*, 535 U.S. 955 (2002); *Commonwealth v. Walker*, 656 A.2d 90, 95 (Pa.), cert. denied, 516 U.S. 854 (1995).

James argues that the evidence at trial shows that he shot "randomly" and "haphazardly" while inside the bar, and thus did not demonstrate a specific intent to kill Carl Sharper or anyone else. James' Brief at 21. Based upon our review of the entirety of the certified record, we disagree. No witness testified at trial that James shooting inside the bar was either random or haphazard. Instead, all essentially offered the same account – that without any warning the bar suddenly exploded in a barrage of gunfire. *See, e.g.*, N.T., 10/1/2013, at 91-94 (Robinson); **id.** at 166-69 (Johnson); N.T., 10/2/2013, at 42-46 (McKee); **id.** at 89 (Aiken); N.T., 10/3/2013, at 47-42 (Kayan); **id.** at 115 (Saboleh). No witness testified with particularity regarding the nature of James' actions during the shooting, including whether or not he aimed his weapon at specific individuals. James' current description of his firing at the bar patrons as "wild," "random," and "haphazard" are his own, and are not grounded upon any evidence of record.

Based upon the evidence presented and given our standard of review, it was within the province of the jury to conclude that James, having been removed from the bar and then returning with a weapon, had the specific intent to kill all the patrons in the bar at whom he directed his fire, including Carl Sharper. ***See Com. ex rel. McCant v. Rundle***, 418 394, 396, 211 A.2d 460, 461 (Pa. 1965) ("If McCant, intending to kill, shot into a crowd, the resulting crime would be first degree murder even if he had never before seen his eventual homicidal victim."). Moreover, the Commonwealth had no burden to prove that James specifically targeted Carl Sharper. Instead, as the above-cited cases plainly establish, it was sufficient to show that he used a deadly weapon on a vital part of Mr. Sharper's body – from which the jury was entitled to infer that James had the specific intent to kill him.

For these reasons, from the evidence presented, the jury could have concluded that James acted with the specific intent to kill Carl Sharper. Accordingly, the evidence was sufficient to sustain James' conviction for first-degree murder.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/2015