J-A16016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TRAVIS LEE PLANK | |
| Appellant | No. 1409 MDA 2019 |

Appeal from the Judgment of Sentence Entered July 30, 2019
In the Court of Common Pleas of Adams County
Criminal Division at No.: CP-01-CR-0001013-2018

BEFORE:  PANELLA, P.J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 26, 2021**

Appellant Travis Lee Plank appeals from the July 30, 2019 judgment of sentence entered in the Court of Common Pleas of Adams County ("trial court"), following his bench convictions for four separate counts of driving under the influence ("DUI") of a controlled substance, and driving under suspension.[1]  Upon review, we affirm.

The facts and procedural history of this case are undisputed.  Following a late-night interaction with state troopers, Appellant was charged with the foregoing crimes.  On November 9, 2018, Appellant filed a suppression motion, challenging the constitutionality of the interaction.  On December 10, 2018, the trial court conducted a suppression hearing, at which the

---

[1] 75 Pa.C.S.A. §§ 3802(d)(1)(i), (ii), (iii) and (2), and 1543(b)(1.1), respectively.

Commonwealth offered only the testimony of Trooper Matthew Hochberg, Pennsylvania State Police. N.T. Suppression, 12/10/18, at 4. Appellant did not present any witness testimony or evidence. The trial court rendered the following findings of fact:

1. Trooper Matthew Hochberg is a Pennsylvania State Police Trooper assigned to Troop H, Gettysburg. Trooper Hochberg has approximately four years of experience and prior to becoming a State Police Trooper he received standard training at the Pennsylvania State Police Academy. That training included detecting people suspected to be under the influence of controlled substances.

2. Over the past four years, Trooper Hochberg has made approximately 120 DUI arrests and he estimates that one-half of them are based upon use of controlled substances. He also has interactions with people who are under the influence of controlled substances frequently, estimated to be once every other shift.

3. On August 6, 2018 at 1:34 a.m., Trooper Hochberg was on duty in full uniform working with his partner, Trooper [Matthew] Geiman. At that date and time, the troopers were in McSherrystown Borough, Adams County.

4. At that date and time, Trooper Hochberg began following a dark colored, 2008 Hyundai sedan. Trooper Hochberg's interest was drawn to the vehicle because he saw a large white drawing on the rear driver's side window.

5. Trooper Hochberg followed the vehicle through McSherrystown for approximately five minutes and observed that the vehicle was driving "evasively." Trooper Hochberg ran an NCIC search of the registration plates which came back to a female [in Hanover]. Trooper Hochberg noticed a male was driving the vehicle and was travelling away from the direction of the address to which the motor vehicle was registered.

6. As the troopers followed the vehicle, they observed it to make three to five turns which the troopers considered to be "odd" at

- 2 -

various stop signs. The driver would signal at the sign as if he was not sure which way he wanted to travel.[2]

7. Eventually, the operator of the Hyundai sedan stopped on his own accord in a driveway off of Sherry Drive in McSherrystown, Adams County, Pennsylvania. The driveway was short, approximately the length of the motor vehicle and fronted a garage.

8. Trooper Hochberg drove toward the motor vehicle and parked his patrol car perpendicular to the suspect vehicle without blocking the vehicle's ability to exit the driveway. Trooper Hochberg parked along the side of the road. When Trooper Hochberg parked and exited his vehicle, he did not utilize any lights or sirens.

9. Trooper Hochberg exited his patrol vehicle and approached the operator of the Hyundai and asked if he could talk to [Appellant] and [Appellant] replied, yes. [Appellant] was the driver.

10. At that time, Trooper Hochberg observed [Appellant] to have glassy and bloodshot eyes, and that [Appellant] appeared to be nervous.

11. Trooper Hochberg asked [Appellant] for his driver's license and [Appellant] replied that he did not have his license with him but that he had one.[3] [Appellant] provided Trooper Hochberg with his name. Trooper Geiman ran the name through NCIC and confirmed that the individual identified was [Appellant], but that his motor vehicle operator's license was suspended. Until the troopers determined that [Appellant's] license was suspended, [Appellant] was free to leave at any time. After the troopers

_____

[2] Trooper Hochberg testified:

The vehicle made a number of stops at different stop signs and paused for long periods of time and flipped the turn signal the last second almost like the individual was deciding which way he was gonna [sic] go right when he got to the stop sign. It was almost as if he didn't know where he was going.

N.T. Suppression, 12/10/18, at 7.

[3] Trooper Hochberg recalled that he asked Appellant a question about the drawing on the window. *Id.* at 10. Appellant, however, was not charged with any violation of Section 4524 of the Vehicle Code, 75 Pa.C.S.A. § 4524, relating to windshield obstructions.

learned that his driver's license was suspended, he was no longer free to leave.

12. [Appellant] did not ask the troopers if he could leave or try to leave the scene at any time.

13. While the troopers followed the motor vehicle through McSherrystown, they did not observe any motor vehicle code violations. Upon approaching the driver, Trooper Hochberg never told the driver, now identified as [Appellant], that he was not free to leave the scene. At the time Trooper Hochberg approached the vehicle, he did not have any reports that the motor vehicle was stolen or any reports of unauthorized use of that motor vehicle. The troopers were unsure who owned the home where the driver stopped. While Trooper Hochberg was talking to [Appellant] by the driver's side window, Trooper Geiman also got out of the patrol vehicle and at some point was situated to the rear of [Appellant's] vehicle, but not blocking the vehicle's ability to exit the driveway.

Trial Court Opinion, 12/12/18, at 1-4 (unnecessary capitalizations omitted). Based on the above findings, the trial court concluded that Appellant's initial interaction with the troopers constituted a mere encounter and thus did not violate the Fourth Amendment to the United States Constitution. Accordingly, the trial court denied the suppression motion.

Appellant waived his right to counsel and proceeded to a bench trial. The trial court found him guilty of four separate counts of DUI of a controlled substance, and driving under suspension. On July 30, 2019, the trial court sentenced Appellant to, *inter alia*, an aggregate term of 18 to 72 months' imprisonment. Although Appellant did not file any post-sentence motion, he timely appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises a single issue for our review.

- 4 -

[I.] Did the lower court err in determining that a mere encounter and not an investigative detention had occurred where two uniformed officers followed Appellant's vehicle for several minutes prior to parking very close to [his] stopped vehicle in an alley, encircling the vehicle on foot and immediately questioning [him] about an alleged Motor Vehicle Code violation?

Appellant's Brief at 4. At the core, Appellant argues that his initial interaction with the troopers was more than a mere encounter and constituted an unlawful investigatory detention.[4] In support, he points out that no reasonable person in his situation would have felt free to leave under the circumstances of this case.

In reviewing appeals from an order denying suppression, our standard of review is limited to determining

whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the

_____

[4] To the extent Appellant's seeks to raise the issue of community caretaking doctrine, such issue is waived. As the trial court aptly notes, Appellant failed to assert this issue below and thus may not do so for the first time on appeal. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). The community caretaking doctrine has been characterized as encompassing three specific exceptions to the state and federal constitutional requirements that police obtain a warrant prior to conducting an unreasonable search or seizure: the emergency aid exception; the automobile impoundment/inventory exception; and the public servant exception, also sometimes referred to as the public safety exception. *Commonwealth v. Livingstone*, 174 A.3d 609, 626 (Pa. 2017). Each of the exceptions contemplates that the police officer's actions be motivated by a desire to render aid or assistance, rather than the investigation of criminal activity. *Id.* at 627. Consequently, "in order for the public servant exception of the community caretaking doctrine to apply, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance." *Id.* at 634. Regardless, even if this issue was not waived, Appellant still would not obtain relief on this basis, because, as we explain below, no seizure occurred here.

appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In re interests of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution protect the people from unreasonable searches and seizures. *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted). The *Lyles* Court explained:

Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop and respond. The second, an "investigatory detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. . . . The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [our Supreme] Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

> [Our Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 302-03 (internal citations and quotation marks omitted). Thus, "[a] mere encounter is characterized by limited police presence, and police conduct and questions that are not suggestive of coercion. Such encounters do not obligate a citizen to stop or respond and, consequently, need not be supported by any level of suspicion." *Commonwealth v. Hampton*, 204 A.3d 452, 456 (Pa. Super. 2019). The hallmark of a mere encounter is that "the subject is free to decline to interact with the police or to answer questions, and is also free to leave at any time." *Id.*

Relatedly, "[w]e adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "To determine whether a citizen's movement has been restrained, court must consider the totality of the circumstances, with no single factor dictating the ultimate conclusion as to whether seizure has occurred." *Livingstone*, 174 A.3d at 621 (citation omitted). In this regard, a variety of factors influence our determination of whether a seizure has occurred. They include "the threatening presence of

several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." ***Id.*** (citation omitted). An additional factor is whether the police officer physically prevents the citizen from leaving. ***See Commonwealth v. Greber***, 385 A.2d 1313, 1316 (Pa. 1978) (plurality) (holding that detaining appellees by blocking their automobile constituted a seizure within the meaning of the Fourth Amendment). Thus, when determining whether an individual is subject to a mere encounter or an investigative detention, "[t]he pivotal inquiry is whether, in light of the facts and circumstances, a reasonable man, innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." ***Hampton***, 204 at 458 (citation omitted).

We find highly instructive ***Commonwealth v. Au***, 42 A.3d 1002 (Pa. 2012). There, a police officer in the early morning hours observed a vehicle parked at a closed business establishment. ***Au***, 42 A.3d at 1003. The court recounted the additional facts as follows:

> According to the officer's testimony, it was unusual to see a car in the location at such time, and he decided to make further inquiry. The officer did not activate the emergency lights of his police cruiser, but he positioned his vehicle at an angle relative to the parked automobile so as to illuminate the passenger side. The officer said that he did so without blocking the egress of the vehicle, he then approached, properly with a flashlight.

***Id.*** As the officer approached the vehicle, the appellant rolled down the passenger side window, and the officer asked "what's going on[?]" ***Id.*** When

- 8 -

the occupants responded that they were just "hanging out," the officer asked if each of the vehicle's six occupants was over the age of eighteen. *Id.* After receiving a negative response, the officer asked the appellant for his identification. When the appellant opened the glove compartment to retrieve his identification, the officer observed two baggies of marijuana. Subsequently, police back-up arrived and a search of the vehicle uncovered more illegal drugs. Following the appellant's arrest, the trial court suppressed the drug evidence. In doing so, the trial court indicated that its decision was controlled by **Commonwealth v. Mulholland**, 794 A.2d 398 (Pa. Super. 2002), a case which holds that the police undertook an investigative detention upon confronting an occupant of a parked vehicle. A three-judge panel of this Court affirmed the trial court's grant of suppression in **Au**, a result that later was sustained by an *en banc* majority of this Court on reargument. **See Commonwealth v. Au**, 986 A.2d 864 (Pa. Super. 2009) (*en banc*). Our Supreme Court, however, granted the Commonwealth's petition for allowance of appeal and reversed, holding that the police officer's interaction with the appellant amounted to no more than a mere encounter. In so holding, the Court reasoned:

> In the present case, the arresting officer's unrebutted testimony indicates that he did not: activate the emergency lights on his vehicle[;] position his vehicle so as to block the car that [the defendant] was seated in from exiting the parking lot[;] brandish his weapon; make intimidating movement or overwhelming show of force; make a threat or a command; or speak in an authoritative tone. . . . . In terms of the use of the arresting officer's headlights and flashlight, this was in furtherance of the

officer's safety, and we conclude it was within the ambit of acceptable, non-escalatory factors. . . . .

Pursuant to governing Fourth Amendment law, we hold that the arresting officer's request for identification did not transform his encounter with [the defendant] into an unconstitutional investigatory detention.

*Au*, 42 A.3d at 1008–09 (citations omitted).

In **Hampton**, the defendant drove his vehicle into the field of a privately owned church. *Id.* Without activating the emergency lights or siren, the police pulled in behind him, "effectively blocking his exit as his vehicle was facing a building, and he could not travel forward." *Id.* In ruling that a reasonable person in the defendant's shoes would not have felt free to leave, this Court focused on the restriction of the defendant's freedom of movement "by means of physical force" by the police. *Id.* Specifically, this Court concluded that the defendant was subject to an investigative detention when the officer parked behind defendant's vehicle in a way that completely blocked defendant's only means of leaving the area. *Id.*

In **Livingstone**, a trooper saw a vehicle pulled over onto the right shoulder of a divided highway with the engine running but the hazard lights not activated. *Id.* a t614. The trooper "***activated*** his emergency lights and, with his passenger window down, pulled alongside the stopped vehicle." *Id.* (emphasis added). After motioning to the driver to roll down the window, he asked her if she was okay. *Id.* The driver appeared to be staring at him with "glossy eyes" but answered affirmatively. *Id.* Nevertheless, the trooper pulled his cruiser in front of the stopped vehicle, exited his vehicle, and

approached the driver on foot. *Id***.** When the trooper reached the vehicle, he asked to see the motorist's driver's license and asked whether she had been drinking. *Id.* The motorist denied drinking but made a number of confused statements. *Id.* Based on these statements and the appearance of the motorist's eyes, described as glossy, a preliminary breath test was administered, and ultimately the motorist was convicted of DUI. *Id.* at 614–15. In light of these facts, our Supreme Court concluded that a seizure had occurred as soon as the trooper pulled alongside the stopped vehicle with activated emergency lights. *Id.*

With the foregoing cases in mind, and given the totality of the circumstances here, we conclude that the trial court did not err in denying Appellant's suppression motion. The troopers interaction with Appellant was a mere encounter. As detailed above, Appellant caught the troopers' attention in the wee hours of the morning when they observed a large white drawing on the vehicle's rear driver's side window. The troopers decided to follow Appellant. During their five-minute pursuit, the troopers observed that Appellant was driving evasively and away from the direction of the address to which the vehicle was registered. Eventually, Appellant, on his own accord, pulled the vehicle into a driveway where he stopped.[5] Trooper Hochberg parked the patrol vehicle perpendicular to Appellant's vehicle without blocking

---

[5] Appellant does not raise any issues with respect to the nature of the driveway or to whom it belonged.

Appellant's ability to exit the driveway. The troopers did not activate emergency lights or sirens. Upon exiting the patrol vehicle,[6] Trooper Hochberg approached Appellant,[7] and asked whether he could talk to him. *See Au*, 42 A.3d at 1007, n.3 (stating that when considering whether an individual has been "seized," a "request obviously differs from a demand"). Appellant answered in the affirmative.[8] At that point, Trooper Hochberg observed that Appellant had glassy and bloodshot eyes and appeared nervous. Trooper Hochberg then asked Appellant for his driver's license. Appellant replied that he did not have his license with him, but that he possessed one. Appellant shared his name with Trooper Hochberg. Trooper Geiman ran the

---

[6] The troopers were attired in uniform. However, while a police uniform is a symbol of authority, a uniform is not, in and of itself, a sufficient exercise of force to render an interaction between an officer and a citizen a "stop". *Commonwealth v. Jones*, 378 A.2d 835, 839-40 (Pa. 1977)

[7] There is no indication in the record—and Appellant does not allege otherwise—that Trooper Hochberg touched Appellant's vehicle or ordered him to lower his window for purposes of communication. *Cf. Commonwealth v. Powell*, 228 A.3d 1, 7 (Pa. Super. 2020) (finding investigatory detention where police ordered the defendant to roll down his window); *Commonwealth v. Adams*, 205 A.3d 1195, 1201 (Pa. 2019) (holding interaction between police officer and defendant was investigative detention, where officer would not allow defendant to leave his vehicle; officer did not simply request that defendant stay in his car; instead, officer physically closed car door and barred defendant's exit; officer's action of physically closing door as defendant opened it communicated demand to remain in car at that location; officer's acts constituted type of escalatory factor that signals "seizure" by restraint of freedom).

[8] The record reveals that Appellant "advised" Trooper Hochberg that he "didn't have a reason to follow him." N.T. Suppression, 12/10/18, at 13.

name through NCIC, confirming Appellant's identify and ascertaining that his driver's license was suspended.[9] At no point did Appellant evince a desire to terminate the interaction.

This case is consistent with **Au** in that Appellant's interaction with the troopers constituted a mere encounter. As the trial court explained,

> the troopers here did not activate emergency lights on the patrol vehicle, did not position the patrol vehicle in a way as to block the car that [Appellant] was seated in from exiting the driveway, the troopers did not brandish weapons, make intimidating movements or an overwhelming show of force, and the troopers did not make a threat or a command or speak in an authoritative tone.

Trial Court Opinion, 12/12/18, at 5. Moreover, this case is distinguishable from **Hampton**, and **Livingstone** because no seizure occurred here. Unlike this case, in **Hampton** the police blocked the defendant's vehicle from exiting. Unlike this case, in **Livingstone** the trooper activated his emergency lights when he pulled up alongside the defendant. Here, as the trial court found, after Appellant pulled over on his own volition, Trooper Hochberg, accompanied by his partner Trooper Geiman, did nothing more than approach Appellant and ask him a couple of questions. Critically, the troopers did not activate their lights or sirens or block Appellant from exiting the driveway. Given the circumstances of this case, and similar to **Au**, Appellant's late-night

---

[9] This case is dissimilar from **Commonwealth v. Cost**, 224 A.3d 641, 652 (Pa. 2020), where the Court determined that the interaction was an investigative detention because the officers retained the defendant's identification while they asked him questions. Here, the troopers were not in possession of any property belonging to Appellant.

interaction with the troopers constituted a mere encounter. We cannot conclude that a reasonable person, innocent of any crimes, would have thought he was being restrained had he been in Appellant's shoes. Thus, Appellant was not seized within the meaning of the Fourth Amendment or Article 1, Section 8 of the Pennsylvania Constitution. The trial court therefore did not err in denying his motion to suppress.[10] Appellant is not entitled to relief.

Judgment of sentence affirmed.

President Judge Panella join the memorandum.

Judge Musmanno files a concurring statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/26/21

---

[10] Even if Appellant's initial interaction with the troopers exceeded the bounds of a mere encounter, he still would not be eligible for relief. As the record here illustrates, the white drawing on the rear driver's side window (of the vehicle that Appellant was operating) first attracted the troopers' attention. To investigate and determine the legality of the drawing, the troopers would have been permitted to temporarily seize Appellant. *See Commonwealth v. Salter*, 121 A.3d 987, 993 (Pa. Super. 2015) ("Where a violation is suspected, but a stop is necessary to further investigate whether a violation has occurred, an officer need only possess reasonable suspicion to make a stop.").